UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOSHUA KRAINIS and CASSANDRA KRAINIS, *individually and as parents of B.K. and E.K.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 2:26-cv-00383-JAW |
| CHRISTOPHER HOWELL, *in his official capacity as superintendent*, and RYAN CARON, *in his official capacity as principal*, | ) | |
| Defendants, | ) | |
| and | ) | |
| PENDER MAKIN, *in her official capacity as Commissioner of the Maine Department of Education* | ) | |
| Defendant-Intervenor. | ) | |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

The parents of two homeschooled teenage children, who object to vaccination on religious grounds, seek a preliminary injunction enjoining school officials from enforcing Maine's vaccination requirements against their children's participation in their local public high school's athletic teams. Because the court concludes that the plaintiffs have failed to demonstrate a likelihood of success on the merits of their constitutional claims and a showing of irreparable harm absent the injunctive relief they seek, the court denies their motion for a preliminary injunction.

## I. BACKGROUND[1]

### A. Procedural History

On July 23, 2026, Joshua and Cassandra Krainis, individually and on behalf of their two minor children, B.K and E.K., (the Plaintiffs) filed a complaint in state court, claiming Maine public school's vaccination policy violates their constitutional rights. *State Ct. R.*, Attach. 3, *Verified Compl.* (ECF No. 6) (*Compl.*). Specifically, the Plaintiffs claim that the local public school's refusal to allow B.K. and E.K. to try out for or play on the school's sports teams without being fully vaccinated, despite the Plaintiffs' sincerely held religious objection, violates their rights to freely exercise their religion and to equal protection under the law. *Id.* ¶¶ 33-52. The Plaintiffs seek a preliminary injunction (PI) enjoining Superintendent Christopher Howell and Principal Ryan Caron (the District Defendants) from enforcing Maine's school sports vaccination laws against B.K. and E.K. *Mot for TRO and/or Preliminary Injunction,* Attach. 7, *Pls.' Mot. for TRO and/or Prelim. Inj., id.,* Attach. 8, *Pls.' Mem. of Law in Supp. of Their Mot. for TRO and/or Prelim. Inj.* (ECF No. 5) *(Pls.' Mem.).*[2] The Plaintiffs also submitted a proposed order granting preliminary injunctive relief, which would permit B.K. and E.K. to try out for and participate on school sports

---

[1] In ruling on the motion as quickly as possible, the Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored." *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

[2] On July 30, 2026, two days after removal, the state court denied the Plaintiffs' motion to the extent the motion sought an ex parte TRO. *See State Ct. R.*, Attach. 11, *Order Denying TRO* at 1-3. The state court sua sponte construed the Plaintiffs' motion as an ex parte TRO, the state court explained, because the Defendants had not been served and the state court could not schedule a hearing by the date the Plaintiffs requested, August 12, 2026, even if the Plaintiffs promptly served the Defendants. *Id.* at 1 n.1.

teams, subject to restrictions where another student on their team or an opposing team has a statutory vaccination exemption and remains unvaccinated. *Mot. for TRO and/or Preliminary Injunction*, Attach. 15, *Proposed Order of Prelim. Inj.* (ECF No. 5) (*Proposed PI*).

On July 28, 2026, the Defendants removed this case to federal court. *Notice of Removal* (ECF No. 1) at 1-2. On August 3, 2026, the Court held a teleconference of counsel. *Min. Entry* (ECF No. 14). On August 4, 2026, the Court granted Commissioner of the Maine Department of Education Pender Makin's unopposed motion to intervene as a party defendant. *Order* (ECF No. 17); *Mot. to Intervene of the Comm'r of the Me. Dep't of Ed.* (ECF No. 8) (*Mot. to Intervene*); *Letter Withdrawing Obj.* (ECF No. 16).

On August 10, 2026, the Defendants filed their response, opposing the Plaintiffs' motion for a TRO. *Dist. Defs.' Opp'n to Pls.' Mot. for TRO* (ECF NO. 18) (*Dist. Defs.' Opp'n*). That same day, Commissioner Makin filed her opposition. *Def.-Intervenor Makin's Opp'n to Pls.' Mot. for a TRO* (ECF No. 19) (*Commissioner's Opp'n*). On August 11, 2026, the Plaintiffs filed separate replies to the District Defendants' and Commissioner's oppositions. *Pls.' Reply to Intervenor's Opp'n to a TRO* (ECF No. 21) (*First Reply*); *Pls.' Reply to Defs.' Opp'n to a TRO* (ECF No. 22) (*Second Reply*).

On August 17, 2026, the Court dismissed the Plaintiffs' motion to the extent it sought a TRO by August 17, 2026, leaving their request for a preliminary injunction pending. *Order on Mot. for TRO* (ECF No. 25). On August 20, 2026, the Court held

a teleconference of counsel to discuss proceedings on the pending motion for preliminary injunction. *Min. Entry* (ECF No. 28). On August 23, 2026, the Magistrate Judge granted the parties' joint motion to amend the scheduling order to establish additional deadlines and procedures governing the preliminary injunction proceedings. *Order* (ECF No. 30); *Joint Mot. for Amend. to Scheduling Order* (ECF No. 29). The Court subsequently scheduled and held an evidentiary hearing on the Plaintiffs' motion for preliminary injunction for October 27 and 28, 2026. *Notice of Hr'g* (ECF No. 31).

On October 29, 2026, the Plaintiffs filed their amended rebuttal arguments.[3] *Pls.' Am. Rebuttal Args.* (ECF No. 37) (*Pls.' Rebuttal).* On October 30, 2026, the District Defendants and Commissioner Makin filed separate sur-rebuttals. *Defs. Christopher Howell and Ryan Caron's Sur-Rebuttal in Opp'n to Pls.' Mot. for Prelim. Inj.* (ECF No. 38) (*District Defs.' Sur-Rebuttal*); *Def.-Intervenor Makin's Closing Arg. Sur-Rebuttal* (ECF No. 39) (*Commissioner's Sur-Rebuttal*). On November 1, 2026, the Plaintiffs filed an additional memorandum addressing privacy concerns associated with their proposed preliminary injunction, attaching materials concerning the Health Insurance Portability and Accountability Act (HIPAA), the Family Educational Rights and Privacy Act (FERPA), and Maine's Student Information Privacy Act. *Privacy Concerns with the Pls.' Proposed PI Order* (ECF No. 40) (*Pls.' Privacy Mem.*). On November 2, 2026, the Court issued an order permitting the Defendants to respond to the Plaintiffs' memorandum by November 5, 2026.

[3] The Plaintiffs filed their rebuttal arguments on October 29, 2026, *Pls.' Rebuttal Args.* (ECF No, 36), which they then amended to correct typographical errors. *Pls.' Am. Rebuttal Args.*, at 1.

*Order on Supplemental Filings* (ECF No. 44). On November 5, 2026, the District Defendants and Commissioner Makin filed separate responses to the Plaintiffs' memorandum concerning privacy issues. *District Defs.' Resp. to Pls.' Privacy Mem.* (ECF No. 46); *Commissioner's Resp. to Pls.' Privacy Mem.* (ECF No. 47).[4]

### B. Factual Background[5]

#### 1. The Parties

Plaintiffs Joshua and Cassandra Krainis are residents of Windham, Maine. *Compl.* ¶¶ 1-2. They are married and have two minor children, B.K. and E.K. *Id.* ¶¶ 1-3. B.K. and E.K. are homeschooled. *Id.* ¶ 15. B.K. is sixteen years old and entering eleventh grade this fall. *Id.* ¶ 4. E.K. is fourteen years old and entering ninth grade this fall. *Id.* ¶ 5. Because they are enrolled in a Maine-approved home school program, B.K. and E.K. qualify for public school resources and services at Windham High School (WHS). *Id.* ¶¶ 13-15; 20-A M.R.S. § 5021-A. During the 2024-2025 and 2025-2026 school years, B.K. played on the WHS boys' basketball team. *Compl.* ¶ 17.

---

[4] On November 3, 2026, the Plaintiffs moved to amend their complaint, attaching a proposed amended complaint. *Pls.' Mot. to Amend Compl.* (ECF No. 45). The amended complaint would expand the constitutional theories in the Plaintiffs' action to include an allegation that the "missing records" exemption renders section 6355 not generally applicable because it gives superintendents discretion to decide who fits within the missing records category. *Id.*, Attach. 1, *Pls.' Am. Compl.* at 1-3. The Defendants and Commissioner's responses are not due until November 24, 2026, and they have not yet responded to the motion. Accordingly, the Court has not acted on the Plaintiffs' motion to amend, and as the new theory has not been briefed or argued, the Court has not considered it in ruling on the pending motion for preliminary injunction.

[5] For the purposes of the requested preliminary injunction, the Court reviews the relevant facts as pleaded in the verified complaint and the declarations submitted by the parties, which the Court takes as true at this stage of the proceeding.

B.K. and E.K. would like to participate in several WHS sports this school year. *Id.* ¶¶ 16-17. B.K. would like to try out for the WHS boys' basketball and baseball teams. *Id.* ¶ 17. Basketball tryouts begin November 17, 2026, and baseball tryouts begin early March 2027.[6] *Id.* E.K. wanted to try out for the WHS girls' soccer and basketball teams. *Id.* ¶ 16. Soccer tryouts began on August 17, 2026, and basketball tryouts begin on November 17, 2026. *Id.*

Defendant Christopher Howell is the Superintendent of School District RSU 14, which includes WHS. *Id.* ¶ 6. Defendant Ryan Caron is the Principal of WHS. *Id.* ¶ 7. The Plaintiffs bring their claims against Superintendent Howell and Principal Caron in their official capacities. *Id.* ¶¶ 6-7. Defendant-Intervenor Pender Makin is the Commissioner of the Maine Department of Education. *Mot. to Intervene* at 1. Commissioner Makin intervenes in her official capacity to defend the constitutionality of the immunization laws challenged by the Plaintiffs. *Id.* at 3-8; 28 U.S.C. § 2403(b); FED. R. CIV. P. 24(a)(1).

### 2. Relevant Maine Law

To attend any Maine public or private elementary or secondary school, Maine law requires every parent shall cause to be administered to that parent's child an adequate dosage of an immunizing agent against nine communicable childhood diseases. 20-A M.R.S. §§ 6352-6355; 05-071-126 ME. CODE R. §§ 1, 2 (LexisNexis 2026). Specifically, the diseases include diphtheria, measles, meningococcal meningitis, mumps, pertussis, poliomyelitis, tetanus, rubella, and varicella. *See* 05-

---

[6] At the hearing, Attorney Whiting confirmed that the tryouts for both boys and girls basketball take place on November 17, 2026, and he urged the Court to issue this order before then.

071-126 ME. CODE R. § 2 (LexisNexis 2026). Section 6355 provides that a "superintendent may not permit any child to be enrolled in or to attend school without a certificate of immunization for each disease or other acceptable evidence of required immunization against the disease." 20-A M.R.S. § 6355.

The State provides limited exemptions to this immunization requirement: (1) a grace period upon written assurance from the parent that the child will be immunized within ninety-days of enrollment or their first day of attendance or a written consent to the child's immunization by a health officer, physician, nurse or other authorized person in public or private employ; (2) a medical professional determines immunization may be medically inadvisable; or (3) if the student had elected a philosophical or religious exemption on or before September 1, 2021 and was covered by an individualized education plan (IEP) on that date.[7] 05-071-126 ME. CODE R. § 3 (LexisNexis 2026); 20-A M.R.S. §§ 6355(1), (2), (4).

Maine law also permits qualifying home school students to access public school resources, including extracurricular activities such as sports, at the public school within the school administrative unit they are otherwise eligible to attend. *See* 20-A M.R.S. §§ 5021(5), 5001-A(3)(A)(1)(c-1) and (A)(1)(4).[8] Among other requirements, qualifying home school students must comply with the same immunization rules as

---

[7] Because Maine eliminated its religious or philosophical exemption in 2021, this exemption permits children who had previously claimed such an exemption to continue to qualify for and claim that eliminated exemption. *See* 20-A M.R.S. § 6355(4); P.L. 2019, ch. 154 §§ 1-3, 12.

[8] Although the complaint cites section 5021-A of title 20-A, the Court cites section 5021, the applicable statute. *Compl.* ¶¶ 15, 18. Section 5021-A applies to private school students enrolled in equivalent instruction programs. Section 5021 applies to students like B.K. and E.K., who are home-schooled per section 5001-A(3)(A)(4).

regularly enrolled students participating in the extracurricular activity. *Id.* § 5021(5)(B). Accordingly, to participate in public school extracurricular activities, such as WHS athletics, B.K. and E.K. must obtain all nine required vaccinations or qualify for an exemption.

### 3. The Underlying Action

The Plaintiffs have sincere religious objections to vaccinating B.K. and E.K. *Compl.* ¶ 32[9]. Until 2012, when the Plaintiffs began adhering to their religious conviction against vaccinations, the Plaintiffs vaccinated B.K. *Id.* E.K. has not received any vaccinations. *Id.* In the past, B.K. participated in WHS sports because he had received the required vaccinations. *Id.* ¶ 17; *Dist. Defs.' Opp'n*, Attach. 1, *Decl. of Christopher Howell* ¶ 11 (*Howell Decl.*). At that time, B.K.'s vaccination status complied with immunization requirements for a student fifteen years of age or younger. *Howell Decl.* ¶ 11. However, after B.K. turned sixteen, he also needed a vaccination against meningitis to remain eligible to play WHS sports. *Id.*

In February 2026, WHS notified the Plaintiffs that B.K. could not play on the boys' baseball team in the spring unless he was vaccinated against meningitis. *Id.* ¶¶ 12-13. On April 10, 2026, Superintendent Howell met with the Plaintiffs and explained that Maine's vaccine laws would not permit B.K. to play on the baseball team or any other WHS extracurricular activity unless he received the required vaccinations or qualified for an exemption. *Id.* ¶ 14-16. Plaintiffs told Superintendent Howell that they did not want to vaccinate B.K., in part because he

---

[9] This paragraph is mislabeled as paragraph 32 despite appearing between paragraphs 19 and 21.

previously had an adverse reaction to a vaccine. *Id.* ¶ 15. Plaintiffs also informed Superintendent Howell that E.K. would be entering ninth grade in the fall of 2026, that she was interested in participating in WHS sports, and that she had received no vaccinations. *Id.* ¶ 18. When Superintendent Howell suggested the Plaintiffs consider requesting a medical exemption, the Plaintiffs indicated they were not interested in pursuing that option and planned instead to join a lawsuit challenging Maine's vaccine law's failure to include a religious exemption. *Id.* ¶ 16. B.K. did not play on the WHS boys' baseball team in Spring 2026. *Id.*¶ 17; *Compl.* ¶ 17.

On June 24, 2026, the Plaintiffs' counsel wrote to the Defendants, requesting WHS excuse B.K. and E.K. from the vaccination requirements because of the Plaintiffs' religious objections. *Compl.* ¶ 21. On July 8, 2026, the WHS Defendants' counsel denied their request for a religious exemption. *Id.* ¶ 22.

On July 23, 2026, the Plaintiffs, individually and on behalf of B.K and E.K., filed a complaint in state court,[10] claiming Maine public school's vaccination policy violates their constitutional right to freely exercise their religion and to equal protection under the law. *Id.* ¶¶ 33-52. The Plaintiffs argue that the lack of a religious exemption when there are other exemptions for unvaccinated students participating in school sports and because other adults, such as coaches and referees, are not required to be vaccinated constitutes religious discrimination and denies them equal protection under the law. *Id.*

**4. The Relief Requested**

---

[10] As noted earlier, the WHS Defendants removed the case to federal court on July 28, 2026. *See Notice of Removal* (ECF No. 1).

The Plaintiffs seek a preliminary injunction prohibiting the District Defendants from enforcing Maine's school sports vaccination requirements against B.K. and E.K. Specifically, the Plaintiffs propose that the Court enjoin the District Defendants from prohibiting their children from "trying out for and playing on sports teams at Windham High School until the court has decided this case on the merits." *Proposed PI* at 3.

The Plaintiffs propose qualifications to this relief. *Pls.' Mem.* at 5–6. Under the proposed order, the District Defendants could prohibit B.K. from "[t]rying out for or playing on a team if any other student trying out for or playing on the team has one of the three statutory exemptions to the school sports vaccination laws and is not vaccinated against meningitis." *Id.* They could also prohibit B.K. from "[p]laying in any game where the opposing team has a student on its team who has one of the three statutory exemptions to the school sports vaccination laws and is not vaccinated against meningitis." *Id.*

The proposed order would similarly permit the District Defendants to prohibit E.K. from "[t]rying out for or playing on a team if any other student trying out for or playing on the team has one of the three statutory exemptions to the school sports vaccination laws and is not vaccinated against one of the nine diseases." *Id.* at 3–4. It would also permit them to prohibit E.K. from "[p]laying in any game where the opposing team has a student on its team who has one of the three statutory exemptions to the school sports vaccination laws and is not vaccinated against one of the diseases." *Id.* at 4.

The Plaintiffs further propose that the District Defendants could prohibit B.K. or E.K. from trying out for or playing on a team if another student on that team lacks a relevant vaccination or if a parent of a vaccinated teammate objects to their participation because another student on the team is unvaccinated. *Pls.' Privacy Mem.* at 1–4. The proposed restrictions would also prevent B.K. or E.K. from playing against an opposing team if the opposing coach reports that a player on that team lacks a relevant vaccination or, in E.K.'s case, has a statutory exemption. *Id.* at 2–4. To implement these conditions, the Plaintiffs propose that the Windham coach notify parents of the presence of an unvaccinated player on the team, without identifying the student, so that parents may raise objections. *Id.* at 4. The Windham coach would also notify opposing coaches of the relevant missing vaccinations, allowing them to determine whether any opposing players lack those vaccinations and report that information to the Windham coach. *Id.*

## II. THE PARTIES' POSITIONS

### A. The Plaintiffs' Motion for a Preliminary Injunction

The Plaintiffs seek a preliminary injunction enjoining the District Defendants from enforcing Maine's vaccination requirements against B.K. and E.K. so that both children may try out for the WHS basketball teams on November 17, 2026. *Pls.' Mem.* at 2–4. The Plaintiffs argue they are likely to succeed on the merits of their free exercise and equal protection claims because (1) unvaccinated students who qualify for a statutory exemption pose a "comparable risk" of contracting and spreading diseases as an unvaccinated student with a religious objection and (2) the vaccination

requirements are "underinclusive" because "adults working with the students – coaches, assistant coaches, referees" are not required to be vaccinated. *Id.* at 6–11. Therefore, the Plaintiffs contend, Maine's vaccination requirements are not generally applicable and are thus subject to strict scrutiny. *Id.* at 12–13.

The Plaintiffs aver that "it is extremely unlikely that the Defendants will be able to clearly demonstrate that they have a compelling interest in discriminating against the Plaintiffs and their children for their religious beliefs while granting exemptions to others and while not requiring adults involved in high school sports to be vaccinated." *Id.* at 13. The Plaintiffs review recent First Circuit caselaw dealing with religious objections to similar vaccination laws, which they submit supports their likelihood of success on the merits. *Id.* at 7–13.

The Plaintiffs also argue that the remaining preliminary injunction factors weigh in their favor. *Id.* at 3–7. Namely, denying B.K. and E.K. the opportunity to try out for the WHS basketball teams despite their religious objections to vaccination would cause irreparable harm. *Id.* at 3–5. The Plaintiffs also aver that the balance of harms and the public interest weigh in their favor because the only "countervailing harm . . . would be the possibility that B.K. could contract meningitis or that E.K. could contract one of the 9 diseases and spread that disease to another unvaccinated player on the team who has one of the three statutory exemptions." *Id.* at 5–6. To address this concern, the Plaintiffs state they are "willing to have the court issue a TRO and/or preliminary injunction that allows the Defendants to prohibit E.K. and B.K. from trying out and/or participating on a team if any other player on the team

has a statutory exemption and is unvaccinated." *Id.* at 5. They propose a corresponding restriction on participation in games against opposing teams with unvaccinated players who qualify for statutory exemptions. *Id.* at 6; *Id.,* Attach. 15.

**B. The District Defendants' Opposition**

The District Defendants oppose the Plaintiffs' motion for a preliminary injunction. Reviewing relevant caselaw, they argue that the Plaintiffs cannot meet their burden of showing a likelihood of success on the merits. *Dist. Defs.' Opp'n* at 6–15. According to the District Defendants, because Maine's vaccination requirements are neutral and generally applicable, rational basis review applies, which the requirements satisfy because they are rationally related to the State's legitimate interest in public health. *Id.* at 7–14. They further contend that the Plaintiffs' equal protection claim is derivative of their free exercise claim and is likewise unlikely to succeed. *Id.* at 14.

The District Defendants also argue that the Plaintiffs will not suffer irreparable harm because their delay in seeking injunctive relief undermines their claim of urgency, participation in public school extracurricular activities is not a fundamental right, and the children may participate in sports outside RSU 14. *Id.* at 15–16. The District Defendants further argue that the balance of equities and public interest weigh against preliminary injunctive relief because "[a]n unvaccinated student poses a real and immediate risk of infection in a school community, even where every student or nearly every student is vaccinated." *Id.* at 17. They contend that the Plaintiffs' proposed "carve-out" is "unworkable" because it "ignores that

communicable diseases pose risks to vaccinated students," and the District Defendants "have no way of knowing whether players on other schools' soccer teams have an exemption under Section 6355." *Id.* at 18. They argue that implementing the proposed restrictions would require a league-wide system for communicating students' vaccination status, implicating student privacy and imposing significant administrative burdens. *Id.* Finally, the District Defendants argue that the Plaintiffs' factual assertions concerning the risks posed by unvaccinated students lack the necessary medical or epidemiological support. *Id.* at 19.

### C. Commissioner Makin's Opposition

Commissioner Makin opposes the Plaintiffs' motion on similar grounds. She argues that the Plaintiffs are unlikely to succeed on the merits of their free exercise claim because Maine's school vaccination requirements are neutral, generally applicable and rationally related to a legitimate government interest. *Commissioner's Opp'n* at 6–17. The Commissioner disputes the Plaintiffs' assertion that the statutory exemptions render the requirements not generally applicable, arguing that the risks posed by students qualifying for the medical exemption, the IEP grandfathering provision, or the 90-day grace period are not comparable to those posed by students seeking religious exemptions. *Id.* at 7–14. She also contends that the absence of vaccination requirements for adults participating in school activities does not undermine general applicability because the risks posed by unvaccinated adults and children are not comparable. *Id.* at 14–16. The Commissioner further argues that applying the vaccination requirements to students participating in school

sports is justified by the risks of disease transmission associated with close contact and shared indoor spaces. *Id.* at 15–17. Alternatively, she maintains that the requirements survive strict scrutiny. *Id.* at 17–19. For similar reasons, she argues that the Plaintiffs are unlikely to succeed on their equal protection claim. *Id.* at 20.

As to the remaining preliminary injunction factors, the Commissioner maintains that the Plaintiffs have not demonstrated irreparable harm because the vaccination requirements do not prevent them from exercising their religion but merely limit their children's opportunity to participate in WHS athletics. *Id.* at 20–21. Finally, she argues that the balance of hardships and the public interest weigh against preliminary injunctive relief because the State's interest in protecting the health of students and the broader public outweighs the harm the Plaintiffs may suffer from being unable to participate in WHS sports. *Id.* at 21.

**D. The Plaintiffs' Replies**

The Plaintiffs' replies largely reiterate their arguments in support of preliminary injunctive relief and respond to specific assertions in the District Defendants' and Commissioner Makin's respective oppositions. *First Reply* at 1–6; *Second Reply* at 1–8. In their reply to Commissioner Makin, the Plaintiffs clarify that they "are not making a facial challenge to the school sports vaccination laws," but instead challenge the Defendants' "enforcement of the vaccination requirements against their children." *First Reply* at 1. They maintain that "the risk of an unvaccinated student with a medical condition contracting and passing on a disease is identical to the risk of an unvaccinated student with a religious objection

contracting and passing on the same disease." *Id.* at 2. They further argue that "the aggregate factors are comparable too," because the exemptions generally last until graduation and "the number of students likely to claim each exemption is about the same." *Id.* The Plaintiffs also dispute the Defendants' characterization of the State's interest, arguing that "the express purpose of the law was to prevent the spread of diseases in schools." *Second Reply* at 2. They maintain that strict scrutiny applies and that "the Defendants have the burden of proving that their enforcement of the school sports vaccination laws against the Plaintiffs' children, despite the Plaintiffs' religious objections to vaccinations." *First Reply* at 5.

As to irreparable harm, the Plaintiffs insist that "[t]he fundamental right they are losing is their First and Fourteenth Amendment rights to Freely Exercise their Religion," rather than merely the opportunity to participate in public school athletics. *Id.* at 6. Finally, the Plaintiffs dispute the District Defendants' contention that their proposed restrictions would be administratively unworkable. *Id.* at 7. They argue that "WHS already knows which students have exemptions from the vaccination laws" and that "[n]o names need to be disclosed." *Id.* The Plaintiffs maintain that "[i]n light of all the concessions the Plaintiffs have offered to make to prevent harm to the players and coaches, the equities and harms should weigh heavily in favor of the Plaintiffs and their children." *First Reply* at 6.

### E. The Plaintiffs' Amended Rebuttal

In their amended rebuttal, the Plaintiffs emphasize that theirs is a "limited 'as applied' action" and that they "are not making a 'facial challenge,' and are not arguing

that the Constitution requires the Legislature to add a religious exemption back into § 6355." *Pls.' Rebuttal* at 1. Although they agree that Judge Neumann's analytical framework in *We the Patriots,* 2:26-cv-00369-SDN, 2026 U.S. Dist. LEXIS 201898 (D. Me. Sep. 8, 2026) is appropriate, they dispute her characterization of the State's asserted interest and contend that she failed to weigh all the "aggregate risk factors" relevant to determining whether the statutory exemptions pose risks comparable to religious exemptions. *Id.* at 2–3. The Plaintiffs further emphasize that they "are only seeking to have their kids play on WHS sports teams" rather than attend school full time and contend that their proposed participation would pose less risk than that of full-time students with medical exemptions. *Id.* at 7. The Plaintiffs raise the argument that the continued attendance of students with missing vaccination records constitutes "selective unenforcement" and that the absence of vaccination requirements for teachers and coaches creates a "major 'underinclusiveness' problem." *Id.* at 11, 13. Finally, they dispute concern that HIPAA, FERPA, or Maine's student privacy law would prevent implementation of their proposed injunction, asserting that "none of those statutes is applicable to this situation." *Id.* at 14.

**F. The District Defendant's Sur-Rebuttal**

In their sur-rebuttal, the District Defendants oppose further briefing on arguments the Plaintiffs could have raised previously. *District Defs.' Sur-Rebuttal* at 1. They further contend that the Plaintiffs' challenge is properly characterized as facial rather than as applied because their arguments concern the general

applicability of § 6355 rather than any claim of discriminatory enforcement by District officials. *Id.* at 2. Finally, they maintain that the Plaintiffs have presented no evidence of selective enforcement at Windham High School, where all students comply with § 6355, and that Superintendent Howell lacks discretion to grant exceptions beyond those prescribed by statute. *Id.* at 2–3.

### G. Commissioner Makin's Sur-Rebuttal

In her sur-rebuttal, Commissioner Makin argues that courts have consistently upheld school vaccination requirements without religious exemptions in the decades since the Supreme Court's last pronouncement on the matter. *Commissioner's Sur-Rebuttal* at 1–3. She further maintains that the State's asserted interest in protecting students and the broader public from vaccine-preventable diseases is supported by the legislative history and should be afforded deference because the Plaintiffs do not contend that the interest is pretextual or has shifted during the litigation. *Id.* at 3. Finally, she disputes the Plaintiffs' argument that the absence of vaccination requirements for teachers and coaches renders the law underinclusive, maintaining that the general applicability analysis should focus on students, the class to which the statutory requirements apply. *Id.* at 4–5.

### H. The Plaintiffs' Arguments Regarding Student Privacy

In their supplemental memorandum, the Plaintiffs argue that their proposed preliminary injunction would not violate HIPAA, FERPA, or Maine's Student Information Privacy Act because the school nurse could inform coaches whether any students have relevant vaccination exemptions through anonymous "Yes" or "No"

responses, without disclosing students' identities or the nature of their exemptions. *Pls.' Privacy Mem.* at 3–6. The Plaintiffs further propose that parents of vaccinated students be permitted to object to their children playing alongside unvaccinated students and that opposing coaches be notified of the vaccinations the Krainis children lack, allowing opposing schools to determine whether any of their players have corresponding exemptions. *Id.* at 4. The Plaintiffs maintain that these procedures would be straightforward to implement and would adequately protect student privacy. *Id.* at 4–6.

**I. The District Defendants' Arguments Regarding Student Privacy**

The District Defendants respond that the Plaintiffs' proposed PI would create substantial student privacy risks and impose significant administrative burdens. *District Defs.' Resp. to Pls.' Privacy Mem.* at 1–2. They argue that even anonymous disclosures of vaccination exemptions could violate FERPA and Maine confidentiality laws because students on small athletic teams may be identifiable through other information available to the school community. *Id.* at 2–4. They further contend that the proposed notification system would require ongoing coordination among coaches, nurses, and administrators across at least sixteen school districts, none of which, apart from RSU 14, are parties to the litigation or necessarily bound by the Court's order. *Id.* at 4–5. Finally, they argue that allowing parents to object to the Krainis children's participation would improperly shift responsibility for enforcing Maine's vaccination requirements to individual families, potentially subjecting them to social

pressure. *Id.* at 5–6. The District Defendants maintain that these concerns weigh against granting preliminary injunctive relief. *Id.* at 6.

### J. Commissioner Makin's Arguments Regarding Student Privacy

Commissioner Makin argues that the Plaintiffs' proposed preliminary injunction would risk violating the confidentiality protections afforded to students' vaccination records and immunization status under Maine law. *Comm'r Makin's Resp. to Pls.' Proposed PI* at 2–3. She contends that 20-A M.R.S. § 6357(1) prohibits disclosure of individual vaccination records or immunization status in the ordinary course and that, given the small size of athletic teams, removing students' names may not sufficiently protect their identities. *Id.* at 2–3. The Commissioner further argues that the Plaintiffs' proposed conditions depend on coaches and administrators from other schools, who are not parties to the litigation, disclosing confidential vaccination information. *Id.* at 3. Accordingly, the Commissioner maintains that the proposed injunction is neither fair to affected students nor workable in light of existing privacy protections. *Id.*

## III. LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting 11A Wright & Miller's Federal Practice & Procedure § 2948, at 129 (2d ed. 1995))). It is "never awarded as a matter of right." *Munaf*, 553 U.S. at 690. To succeed on a motion for preliminary injunction, the movant must establish four elements: (1) substantial likelihood of

success on the merits; (2) a high likelihood of irreparable harm if injunctive relief is not granted; (3) a balance of equities tips in the movant's favor; and (4) the injunctive relief is in the public interest. *Voice of the Arab World*, 645 F.3d at 32 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In First Amendment cases, the likelihood of success on the merits is the linchpin of the analysis. *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam). Indeed, if the movant fails to make that showing, the remaining factors carry little weight. *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). At this preliminary stage, the Court need not conclusively resolve the merits of the movant's claims. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). It is sufficient for the Court to evaluate whether the movant made "a clear showing" as to their likelihood of success. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Ultimately, courts enjoy wide discretion regarding the appropriateness of preliminary injunctive relief. *See Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 158 (1st Cir. 2004).

## IV. DISCUSSION[11]

### A. Likelihood of Success on the Merits

In *We the Patriots USA, Inc. v. Makin,* 2026 U.S. Dist. LEXIS 201898, a court in this district recently considered a similar challenge to Maine's school vaccination requirements under the Free Exercise Clause. There, the plaintiffs sought to enjoin

---

[11] Because section 5021(5)(B) requires homeschooled students to satisfy the same immunization requirements as regularly enrolled students, and RSU 14 requires regularly enrolled students to comply with Maine's school immunization law, 20-A M.R.S. § 6355, the Court analyzes the statutes together insofar as they govern the Plaintiffs' eligibility to participate in interscholastic athletics.

school officials from enforcing 20-A M.R.S. § 6355 against a student, who wished to continue to enroll in school, whose father objected to vaccination on religious grounds. *Id.* at *1–2, *7. The court denied the requested preliminary injunctive relief, concluding that the plaintiffs had not demonstrated a likelihood of success on the merits of their constitutional claims. *Id.* at *6–40. The Court adopts *We the Patriots*' comprehensive articulation of the law governing Free Exercise challenges, including the principles and legal standards governing neutrality, general applicability, the comparability of secular and religious exemptions, and the level of scrutiny applicable to such challenges in the First Circuit. Rather than repeat the *We the Patriot* Court's thorough analysis of the governing cases, the Court incorporates that analysis by reference and proceeds to independently apply the Free Exercise Clause's governing standards articulated in *We the Patriots* to the facts and arguments of this case.

### 1. Free Exercise Clause

#### a. Neutrality

The Court first considers whether Maine's school vaccination requirements are neutral with respect to religion. The Court adopts the governing legal precedent concerning neutrality set forth in *We the Patriots*, 2026 U.S. Dist. LEXIS 201898, at *12–16 and does not repeat that analysis here. Instead, the Court applies those principles to independently evaluate the arguments and record in this case. In *We the Patriots*, the court concluded that 20-A M.R.S.§ 6355 is facially neutral because it "does not reference religion or religious conduct 'without a secular meaning discernable from the language or context.'" *We the Patriots*, 2026 U.S. Dist. LEXIS

201898, at *13 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

The Plaintiffs do not identify any provision of section 5021 or section 6355 that expressly targets religious conduct, nor do they identify evidence that the Defendants have refused to permit B.K. and E.K. to participate in school athletics because of hostility toward their religious beliefs. The legislative history of Maine's school vaccination requirements likewise does not suggest hostility toward religion. Maine first enacted mandatory school immunization requirements in 1977, in response to concerns about the "large number of Maine children entering school without [the] benefit of basic immunization against childhood diseases," which the Legislature understood to "constitute[] a serious threat to themselves and to others." *Commissioner's Opp'n* at 2 (quoting Statement of Fact, L.D. 1264 (108th Legis. 1977)). The Legislature also considered the multiple outbreaks of "various childhood communicable diseases" in Maine and elsewhere. *Id.* (quoting 2 Me. Legis. Rec. 1974 (1977)).

In 2019, the Legislature revisited the statutory requirements amid declining childhood vaccination rates. *Id.* at 3. At that time, Maine permitted exemptions when vaccination was "(A) medically inadvisable, (B) contrary to a sincerely held religious belief, or (C) opposed for philosophical reasons". *Id.* (citing 20-A M.R.S. §§ 6355(2)–(3) (2008)). Statewide exemption rates had reached 6.2% among kindergarten students, 4.7% among seventh-grade students, and 5.1% among twelfth-grade students. *Id.* (citing *Id.* Attach. 1, *Decl. of Jessica Shiminski* ¶ 21 (ECF

No. 19-1) (*Shiminski Decl.*)). In February 2019, the Legislature introduced L.D. 798, entitled "An Act To Protect Maine Children and Students from Preventable Diseases by Repealing Certain Exemptions from the Laws Governing Immunization Requirements," which proposed eliminating both religious and philosophical exemptions. *Id.* at 3–4 (citing L.D. 798, 129th Legis. (Me. 2019)).

During the legislative debate, Representative Brennan observed that "[h]ere in Maine, children are three times less likely to be vaccinated than the national average, one of the worst in the country." *We the Patriots*, 2026 U.S. Dist. LEXIS 201898, at *14 (quoting 129 Legis. Rec. H-398 (1st Reg. Sess. 2019)). Other legislators expressed concern about the consequences of permitting nonmedical exemptions to continue. *Id.* Representative McDonald, for example, warned that "[w]ith nonmedical exemption rates this high in Maine's schools, it's not a question of will an outbreak occur, it's a question of when." *Id.* at *14–15 (quoting 129 Legis. Rec. H-401 (1st Reg. Sess. 2019)).

As the *We the Patriots* Court observed, "forceful advocacy for a public health measure is not evidence of hostility to religion." *Id.* at *15. Such statements concern the public health consequences of declining vaccination rates, rather than expressing animus toward religious beliefs. *Id.*; *see also Miller v. McDonald*, 180 F.4th 420, 429 (2d Cir. 2026) (explaining that, even if isolated legislative remarks reflect religious antipathy, "the motives of a small number of legislators cannot be attributed to the legislative body as a whole"). Moreover, as the First Circuit observed in *Doe v. Mills,* Maine eliminated both religious and philosophical exemptions from mandatory

vaccination requirements "and thus did not single out religion alone." 16 F.4th 20, 30 (1st Cir. 2021).

Because the Plaintiffs identify no evidence that the challenged requirements were motivated by hostility toward religion or that the Defendants enforced those requirements in a manner reflecting religious animus, the Court concludes that the Plaintiffs have not demonstrated a likelihood of establishing that the challenged requirements lack neutrality toward religion.

**b. General Applicability**

The Court adopts the governing legal precedent concerning general applicability set forth in *We the Patriots*, 2026 U.S. Dist. LEXIS 201898, at *16–18, *25–29, and does not repeat that analysis here. Instead, the Court applies those principles, including standards governing comparable secular exemptions and mechanisms for individualized exemptions, to the arguments and facts of this case.

The Plaintiffs contend that Maine's school vaccination requirements are not generally applicable because they permit secular conduct that poses risks comparable to the religious conduct the Plaintiffs seek to undertake. *Pls.' Mem.* at 7–11. They maintain that the Defendants' refusal to permit B.K. and E.K. to participate in WHS athletics therefore violates the Free Exercise Clause. *Id.*

As *We the Patriots* articulated, a law is not generally applicable if it "either (1) treats any comparable secular activity more favorably than religious conduct . . . or (2) invites the state to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* at 16 (internal quotations

omitted). The Court first addresses whether the challenged vaccination requirements treat comparable secular activity more favorably than religious exercise before considering whether the statutory exemptions establish a system of individualized exemptions.

**i. Comparable Secular Activity**

The Plaintiffs argue that the vaccination requirements at issue are not generally applicable because the statutory exemptions "create comparable risks to the religious exemptions being sought by the Plaintiffs" and the requirements are "'underinclusive' in that they don't require adults working with the students – coaches, assistant coaches, referees – to be vaccinated." *Pls.' Mem.* at 7.

As *We the Patriots* explained, the Court must first identify the governmental interest underlying the challenged requirements. 2026 U.S. Dist. LEXIS 201898, at *16–17 (citing *Brox v. Woods Hole*, 164 F.4th 37, 45 (1st Cir. 2026)). Once that interest is identified, the Court must determine whether the permitted secular exemption undermines it to a degree comparable to the prohibited religious conduct. *Id*. at *16-17 (citing *Brox*, 164 F.4th at 45).

The relevant statutory purpose of section 6355 is to protect the health and safety of students and society at large. *See We the Patriots,* 2026 U.S. Dist. LEXIS 201898, at *17. Section 6352 identifies the purpose of Maine's school immunization requirements as ensuring "a safe and healthful school environment." 20-A M.R.S. § 6352. In *We the Patriots*, the Court noted that that nothing in the record suggested

this title was "'pretextual' or a 'post-hoc rationalization[].'" *Id.* (quoting *Brox*, 164 F.4th at 47). The Court agrees.[12]

Here, the Plaintiffs contend that the statutory exemptions "create comparable risks to the religious exemptions being sought by the Plaintiffs." *Pls.' Mem.* at 7. They also maintain that unvaccinated adults who interact with student athletes present comparable risks. *Id.* at 9–13. The Court must assess these asserted comparisons against the State's interest in protecting student health and preventing the spread of communicable diseases.

As the Supreme Court explained in *Tandon*, "[c]omparability is concerned with the risks various activities pose, not the reasons why people gather." 593 U.S. at 62. Thus, the fact that one person remains unvaccinated for religious reasons while another remains unvaccinated for medical or other secular reasons does not, by itself, resolve whether the activities are comparable under the Free Exercise Clause.

[12] The Plaintiffs dispute *We the Patriots*' characterization of the State's interest as protecting "the health and safety of schoolchildren and society at large." *Pls.' Rebuttal* at 3–5. They argue "[t]here is nothing in that statement of intent to support a finding that the Legislature's intent was to generally 'protect the health and safety of schoolchildren and society at large.' Only to assure a safe and healthful school environment." *Id.* at 3. Although they acknowledge their earlier concession that "the State's interest in vaccination is to prevent the spread of contagious disease," they contend that "that concession is a far cry from conceding that the Legislature's intent in enacting the school vaccination laws was to generally 'protect the health and safety of schoolchildren and society at large.'" *Id.*

The Commissioner responds that the First Circuit has explained that the "interests most emphasized by [a party] throughout the litigation and in the historical record are relevant to determining what its asserted interests are." *Commissioner's Sur-Rebuttal* at 3 (quoting *Brox*, 164 F.4th at 46).

The Court disagrees with the Plaintiffs' proposed limitation on the State's asserted interest and agrees with the *We the Patriots* court that the interest in protecting "the health and safety of schoolchildren and society at large" is broadly consistent with the Legislature's stated purpose of ensuring "a safe and healthful school environment." 2026 U.S. Dist. LEXIS 201898, at *17 (quoting 20-A M.R.S. § 6352). Protecting schoolchildren from communicable diseases necessarily serves the health and safety of the broader community, including those with whom students interact outside school. The Court therefore adopts Judge Neumann's characterization of the State's asserted interest.

The First Circuit recently clarified the relevant inquiry in *Brox*. 164 F.4th at 47-48. The comparison does not turn on "whether the risks associated with one individual who for religious reasons is unvaccinated are comparable to those associated with an individual who remains unvaccinated" for secular reasons. *Id.* at 47. Instead, courts must "consider and compare the risks presented by groups of different sizes in different settings." *We the Patriots*, 2026 U.S. Dist. LEXIS 201898 at *18 (quoting *Brox*, 164 F.4th at 47) (citing *Tandon,* 593 U.S. at 63-64). Accordingly, a court must consider "the number of exempted individuals as well as their locations and durations of the exemptions." *Brox*, 164 F.4th at 47–48.

This distinction bears directly on the Plaintiffs' reliance on *Fox v. Makin*, 2:22-cv-00251-GZS, 2023 U.S. Dist. LEXIS 142983 (D. Me. Aug. 16, 2023), and *Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023). The Plaintiffs emphasize that, in *Fox*, the Court found it plausible at the motion-to-dismiss stage that section 6355's secular exemptions undermined the State's interests in a manner comparable to a hypothetical religious exemption. *Pls.' Mem.* at 8–9; *Fox*, 2023 U.S. Dist. LEXIS 142983 at *19. They also rely on *Lowe*, in which the First Circuit concluded that a complaint plausibly alleged that a medical exemption to a healthcare-worker vaccination mandate undermined the State's interests in a manner comparable to a religious exemption. *Id.* at 10; *Lowe,* 68 F.4th at 709, 715.

Those decisions, however, addressed the sufficiency of allegations at the pleading stage. In *Lowe*, the First Circuit expressly qualified its holding, concluding that the plaintiffs had stated a claim "based on the plaintiffs' allegations and in the absence

of further factual development". 68 F.4th at 709. The Plaintiffs in the instant case seek preliminary relief, requiring the Court to assess whether the evidence before it establishes a likelihood of success on the merits.

With these principles in mind, the Court considers whether the statutory exemptions and the treatment of adults participating in school athletics undermine the State's asserted interests in a manner comparable to the religious exemption the Plaintiffs seek.

**(1) Ninety-Day Grace Period**

The Plaintiffs first challenge the ninety-day grace period exception under 20-A M.R.S. § 6355(1), relying on what they characterize as the Attorney General's concession in *Fox* that "[a] new student attending school for 90 days without first receiving one or more of the required vaccinations poses the same risk of spreading those diseases to other students as a student with religious objections who attends school for that same period of time without being vaccinated against those diseases." *Pls.' Mem.* at 9. They thus contend that the provision treats students differently based on the reasons for their non-vaccination, despite the comparable risks they pose. *See id.* at 9–11.

The ninety-day grace period, however, facilitates compliance with the vaccination requirements rather than excusing it indefinitely. Section 6355(1) permits temporary school attendance where "[t]he parent provides a written assurance the child will be immunized within 90 days by private effort or provides, where applicable, a written consent to the child's immunization by a health officer,

physician, nurse or other authorized person in public or private employ." 20-A M.R.S. § 6355(1). As *We the Patriots* explained, the provision "is a limited accommodation that facilitates compliance with § 6355's immunization requirements; it does not create a permanent exception to vaccination, as a religious exemption would." 2026 U.S. Dist. LEXIS 201898, at *19.[13]

That the risk posed by an individual unvaccinated student during the ninety-day period may be comparable in the short term does not establish that the grace period undermines the State's asserted interest to the same degree as a religious exemption. As the First Circuit explained in *Brox*, the relevant inquiry requires consideration of the risks presented by groups of different sizes and the durations of their exemptions, rather than the risk associated with each individual unvaccinated person. 164 F.4th at 47–48. Here, Dr. Blaisdell[14] testified that the grace period is "not a true exemption," but rather a means of "working towards vaccination" unlike a "durable exemption" from vaccination. She further explained that children using the grace period are often already partially vaccinated and "just need to be caught up." As Dr. Blaisdell observed, "[g]enerally speaking, there is increasing levels of

---

[13] The Plaintiffs argue that the *We the Patriots* Court failed to consider the aggregate risk posed by the 90-day grace period, including the number of students receiving it, its recurrence each school year, and the possibility of subsequent medical exemptions. *Pls.' Rebuttal* at 8. The Court notes that the Plaintiffs provide no record citations to support the numerical figures advanced in their rebuttal, leaving the Court unable to assess their evidentiary basis. In any event, these considerations do not alter the fundamental distinction *We the Patriots* establishes: that the grace period facilitates compliance with vaccination requirements while a religious exemption excuses compliance altogether.

[14] Dr. Laura Blaisdell is a board-certified pediatrician who has practiced medicine in Maine since 2008 and holds a master's degree in public health. She practices pediatrics at Maine Medical Center, where she teaches evidence-based medicine to medical students and residents, and also serves as an Assistant Professor at the Tufts University School of Medicine. She is also a president of the Maine Chapter of the American Academy of Pediatrics. Her research has focused on vaccination, infectious diseases, and vaccine hesitancy. *Blaisdell Decl.* ¶¶ 1–2.

protection with each dose of vaccine that we give. So one dose is more -- is more protection than no doses." These distinctions are significant. The ninety-day grace period is a temporary mechanism for achieving vaccination, whereas the religious exemption the Plaintiffs seek would permit B.K. and E.K. to remain unvaccinated for the full duration of their participation in WHS athletics. The Court therefore concludes that the ninety-day grace period does not permit "secular conduct that undermines the government's asserted interests in a similar way" to the religious exemption the Plaintiffs seek. *We the Patriots,* 2026 U.S. Dist. LEXIS 201898 at *19-20 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021)).

**(2) Medical Exemptions**

The Plaintiffs also contend that the medical exemption under section 6355(2) undermines the State's asserted interest by permitting students to remain unvaccinated while attending school and participating in athletics. *Pls.' Mem.* at 7–11. They rely on what they characterize as the Attorney General's concession in *Fox* that "[a] student with a medical reason for not taking one or more of the 9 required vaccinations poses the same risk of spreading those diseases to other students as a student with religious objections who attends school without being vaccinated against those diseases." *Id.* at 9 (citing *Fox*, 2023 U.S. Dist. LEXIS 142983). Citing *Lowe v. Mills*, the Plaintiffs maintain that the relevant inquiry is whether the exemptions pose comparable risks of disease transmission, regardless of the reasons for non-vaccination. *Id.* at 10–11 (citing 68 F.4th 706 (1st Cir. 2023)).

Medical exemptions, however, differ from religious exemptions in important qualitative and quantitative respects. First, as *We the Patriots* explained, "the medical exemption serves rather than undermines Maine's interest in health and safety." 2026 U.S. Dist. LEXIS 201898, at *19.

Medical exemptions are also limited by established medical standards. As Dr. Blaisdell explains, "[m]edical exemptions are medically appropriate when generally recognized contraindications to vaccination exist as determined by national standards." *Commissioner's Opp'n* Attach. 2, *Decl. of Laura Blaisdell* (ECF No. 19-2) ¶ 20 (*Blaisdell Decl.*). Consistent with those standards, section 6355(2) permits a licensed physician, nurse practitioner, or physician associate to excuse a student from vaccination upon determining that immunization "may be medically inadvisable" for that student. 20-A M.R.S. § 6355(2). The exemption thus protects students for whom vaccination itself may pose a health risk and is confined to a narrow set of medically recognized circumstances, as determined by qualified healthcare professionals.

Courts accordingly have recognized that medical exemptions do not undermine public-health interests in a manner comparable to religious exemptions. The First Circuit, to which this Court owes its allegiance, has already ruled against the Plaintiffs' argument about medical exemptions. In *Does 1-6*, the First Circuit wrote:

> We conclude that exempting from vaccination only those whose health would be endangered by vaccination does not undermine Maine's asserted interests here: (1) ensuring that healthcare workers remain healthy and able to provide the needed care to an overburdened healthcare system; (2) protecting the health of the those in the state most vulnerable to the virus -- including those who are vulnerable to it because they cannot be vaccinated for medical reasons; and (3)

> protecting the health and safety of all Mainers, patients and healthcare workers alike.

16 F.4th at 30; *accord We the Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 153 (2d Cir. 2023) (medical exemptions permit "the small proportion of students who cannot be vaccinated for medical reasons to avoid the harms that taking a particular vaccine would inflict on them"); *Perry v. Marteney*, 172 F.4th 315, 326 (4th Cir. 2026) ("[m]edical classifications and exemptions are an inescapable part of health regulation").

The geographic distribution of exempted students further distinguishes medical exemptions from religious exemptions for purposes of comparability. *See Brox*, 164 F.4th at 47–48 (directing courts to consider "the number of exempted individuals as well as their locations"). Dr. Blaisdell explained that the conditions warranting medical exemptions "are rare, stable in prevalence and incidence, and tend not to cluster in a localized manner." *Blaisdell Decl.* ¶ 22. Dr. Blaisdell testified that "[d]issimilar to non-medical exemptions they do not cluster. They do not -- cluster in the same way, excuse me, and to the same degree. They have clearer definitions. And we have a check and balance system for medical exemptions of people who receive them, and for that reason I believe they pose a decreased risk."

The relative lack of prevalence of medical compared to religious exemptions further distinguishes the risks they pose to the State's asserted public-health interests. Maine CDC data show that statewide medical-exemption rates did not exceed 1.5% among kindergarten, seventh-grade, or twelfth-grade students in any school year from 2018–2019 through 2024–2025. *Shiminski Decl.* ¶¶ 36–42. By

contrast, Dr. Blaisdell testified that "[p]rior to 2021 Maine nonmedical exemptions were increasing year on year."

Citing Maine Department of Health and Human Services data from the 2020–2021 school year, the Plaintiffs report that "0.3 % of Kindergarteners in Maine had religious exemptions, whereas 0.5% had medical exemptions," that "0.4% of 7th graders in Maine had religious exemptions, whereas 0.2% had medical exemptions," and that "0.3% of 12th graders in Maine had religious exemptions, whereas the same percent (0.3%) had medical exemptions." *Second Reply* at 3. They further argue that "[f]or both exemptions, the exemption will usually last until the student graduates, and the statistics maintained by Maine DHHS show that the number of students likely to claim each exemption is about the same." *First Reply* at 2.

However, the rates Plaintiffs report do not distinguish between temporary and longer-term exemptions. *Shiminski Decl.* ¶ 17 (data for the number of medical exemptions "includes temporary medical exemptions for students on vaccine catch-up schedules"). Thus, these figures do not establish how many students held medical exemptions comparable in duration to the permanent religious exemptions the Plaintiffs seek.

At this preliminary stage, the Court concludes that the Plaintiffs are unlikely to establish that the medical exemption is comparable to a religious exemption. Although both permit unvaccinated students to attend school, the medical exemption protects students for whom vaccination itself poses a health risk. Moreover, medical contraindications are rare and do not tend to cluster geographically, whereas

religious exemptions may produce concentrations of unvaccinated students, increasing the risk of outbreaks. The two exemptions therefore do not undermine the State's asserted public-health interest to the same degree.

**(3) IEP Legacy Provision**

The Plaintiffs also challenge the IEP grandfathering provision under section 6355(4), which permits students who had an IEP in place and had claimed a religious or philosophical exemption from the vaccination requirements on or before September 1, 2021, to retain that exemption. 20-A M.R.S. § 6355(4). They argue that "[w]hile allowing new students, students who have medical conditions, and special ed. students to play on sports teams without taking the vaccinations may be laudable, these students all pose the same risk of contracting and spreading diseases that religious objecting students would." *Pls.' Mem.* at 11. They further rely on the that "[a] student covered by an individualized education plan with a philosophical or religious exemption from taking one or more of the 9 required vaccinations poses the same risk of spreading those diseases to other students as a student with religious objections who attends school without being vaccinated against those diseases." *Id.* at 9 (citing *Fox*, 2023 U.S. Dist. LEXIS 142983).

The IEP legacy provision, however, differs from the requested religious exemption in both its scope and duration. Section 6355(4) preserves an existing exemption only for students who had an IEP in place and had previously claimed a religious or philosophical exemption before September 1, 2021. 20-A M.R.S. § 6355(4). As *We the Patriots* explained, the provision applies to "a finite, closed

population defined by two facts fixed in time," and "[t]he use of this exemption will necessarily diminish as those students graduate or age out, ultimately reaching zero." 2026 U.S. Dist. LEXIS 201898, at *22-23. "Religious exemptions, by contrast, have no temporal limitation." *Id.* at 23.[15]

The Plaintiffs' reliance on the comparable risk of disease transmission posed by individual unvaccinated students does not account for these distinctions. Under *Brox*, the Court must consider the "aggregate data about transmission risks," such that they review "the number of exempted individuals as well as their locations and the durations of the exemptions," rather than assessing the risk posed by each individual in isolation. 164 F.4th at 47–48 (citing *Lowe,* 68 F.4th at 716 (quoting *Hochul*, 17 F.4th at 287)). Although the Maine CDC data before the Court does not speak to whether this class as a whole has declined, the statutory eligibility cutoff prevents additional students from becoming eligible. *See Shiminski Decl.* ¶¶ 16, 32–35.

The provision also reflects the State's obligations under federal special education law. As *We the Patriots* observed, the IEP legacy provision functions as "a means of complying with federal law." 2026 U.S. Dist. LEXIS 201898, at *23 (quoting *Grimsby v. Pan*, No. 5:25-cv-01575-AB-JC, 2025 U.S. Dist. LEXIS 200259 (C.D. Cal. Aug. 29, 2025)). Specifically, the federal Individuals with Disabilities Education Act (IDEA) requires schools to implement existing IEPs and limits their ability to modify

---

[15] The Plaintiffs argue that the IEP exemption may remain available until 2040, whereas B.K. and E.K. seek exemptions lasting only two and four years, respectively. *Pls.' Rebuttal* at 9. But the relevant distinction is that the IEP provision applies to a finite, diminishing class, whereas the religious exemptions Plaintiffs seek would create a new permanent basis for eligibility.

those plans without providing procedural protections. *See* 20 U.S.C. § 1415(j) (providing that, during the pendency of proceedings under the Act, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child"). As the Ninth Circuit explained, "[t]he IEP cannot be changed unilaterally; it may be adjusted only through a process that provides the student with certain procedural protections." *Doe v. San Diego Unified Sch. Dist.,* 19 F.4th 1173, 1179-80 (9th Cir. 2021). Accordingly, *We the Patriots* concluded the IEP legacy provision reflects "a legally constrained accommodation, not a discretionary secular preference the State was free to extend to religious objectors generally." 2026 U.S. Dist. LEXIS 201898, at *23.[16] The Court agrees, and therefore concludes that the Plaintiffs have not shown a likelihood of success in establishing that 20-A M.R.S. §§ 5021(5) and 6355 treat comparable secular conduct more favorably than religious conduct, thereby undermining the State's asserted interests to the same degree.

**(4) Unvaccinated Adults**

The Plaintiffs also contend that Maine's school vaccination requirements are underinclusive because they do not apply to adults who work with students, including "coaches, assistant coaches, referees," notwithstanding the allegedly comparable risks posed by unvaccinated adults and students. *Pls.' Mem.* at 2. In support, the

---

[16] The Plaintiffs argue that the IDEA's procedural protections for existing IEPs do not require Maine to preserve vaccination exemptions for students with those plans. .*Pls.' Rebuttal.* at 9–10. The Court recognizes the distinction between preserving an IEP and preserving a previously available vaccination exemption. Nevertheless, the IEP provision is distinguishable because it preserves the eligibility of a finite class rather than establishing an ongoing basis for exemption.

Plaintiffs rely on what they characterize as the Attorney General's concession in *Fox v. Makin* that "people working in or visiting a school - both adults and children - who have not been vaccinated against one or more of the 9 diseases and who have contact with students pose the same risk of spreading those diseases to students as do students with religious objections who attend school without being vaccinated against those diseases." *Id.* at 9.

As the Second Circuit explained in *Kane v. De Blasio*, "neither the Supreme Court, our court, nor any other court of which we are aware has ever hinted that a law must apply to all people, everywhere, at all times, to be 'generally applicable.'" 19 F.4th 152, 166 (2d Cir. 2021). Rather, "a law can be generally applicable when . . . it applies to an entire *class* of people." *Id.* (emphasis in original). The Second Circuit reasoned that the excluded categories did not present comparable risks because, unlike those included, the excluded category of people did not ordinarily have prolonged daily contact with large groups of students. *Id.* ("While the exempt groups do not come into prolonged daily contact with large groups of students (most of whom are unvaccinated), the covered groups (for example, teachers) inevitably do").

The Court finds *Kane*, a Second Circuit case, instructive but not, of course, dispositive. The Court must determine whether children and adults are likely to pose comparable risks to the State's asserted public health interests. Unlike the mandate in *Kane*, which regulated and differentiated among classes of school employees, Maine's laws at issue here regulate schoolchildren. The available evidence

establishes several material distinctions between these populations. Dr. Benowitz[17] explains that "children in schools or participating in school athletics who are not immunized against those diseases are at greater risk of both contracting and spreading those diseases than adults in schools and school athletic environments who are not immunized against those same diseases." *Commissioner's Opp'n,* Attach. 4, *Decl. of Dr. Isaac Benowitz* ¶ 14 (*Benowitz Decl.*). Dr. Blaisdell similarly explains that "schools are a particularly high-transmission environment for communicable diseases" and that "[s]chool environments are often high in density and crowding is a known risk factor for spread of communicable diseases." *Blaisdell Decl.* ¶ 12. Dr. Benowitz further observes that "children, particularly children who are not immunized, have less developed immune systems to fight off infection" and that "[s]chool-aged children have developmental considerations that make them less likely than adults to be able or willing to practice adequate hand and cough hygiene." *Benowitz Decl.* ¶¶ 21–22. Adults, by contrast, "have had at least 18 years of community exposure to communicable diseases in schools and in the broader community." *Id.* ¶ 20. Finally, Dr. Blaisdell explains that "schools and school children can and do serve as a critical public health vector to control the spread of communicable disease in the broader community," whereas "[t]his is not true of adults who are working within school settings, for whom required vaccination would

[17] Dr. Isaac Benowitz is a State Epidemiologist and Chief Medical Officer at the Maine Center for Disease Control and Prevention, where he has worked since 2021. *Benowitz Decl.* ¶¶ 1, 2.. He received his M.D. from the Yale School of Medicine and his M.P.H. from the Emory Rollins School of Public Health. ¶ 3.

not achieve the same public health goals of widespread immunity." *Blaisdell Decl.* ¶ 13.

Dr. Benowitz also opines that "school athletes may come into contact in close proximity and share air spaces in locker rooms, buses, and weight rooms before or after athletic practices or other events," and that "[r]apid, deep breathing during exercise increases the volume of respiratory droplets and airborne aerosols that are exhaled and inhaled, thereby increasing the risk of transmission of the non-tetanus Diseases." *Benowitz Decl.* ¶¶ 17–18.[18]

Dr. Benowitz's testimony also identified differences between adults and children relevant to the risks of contracting and transmitting infectious diseases. When asked whether children and adults are similarly susceptible to communicable diseases from a immune-response standpoint, Dr. Benowitz testified that "[t]hey're not the same," because "there are changes in the immune system over the course of the lifetime" and "many of these diseases presents differently at different age groups or age ranges." He also identified "important behavioral differences," observing that children "put more things into their mouths" and "get into dirt more readily than most adults do."

The Plaintiffs maintain that "unvaccinated adults who work in schools and who have close contact with the students pose the same risk of spreading diseases to

[18] Dr. Benowitz distinguishes tetanus from the other diseases covered by Maine's vaccination requirements because "[t]etanus is not contagious and does not spread from person to person." *Benowitz Decl.* ¶ 10. Nevertheless, he explains that "children who are unimmunized against tetanus [are] more likely to contract tetanus than adults who are unimmunized against tetanus," *id.* ¶ 12, because "[a] child who participates in athletics, particularly on dirt or natural grass, is more likely to come in contact with tetanus bacteria during athletics than a coach or other non-player." *Id.* ¶ 13.

students as do unvaccinated students with religious objections." *First Reply* at 5. The Plaintiffs do not, however, directly respond to the Commissioner's arguments drawing on expert evidence concerning differences in the risks of contracting and transmitting vaccine-preventable diseases associated with children and adults. *See Commissioners Opp'n* at 15 (citing *Benowitz Decl.* ¶¶ 12, 14, 19–22).

The presence of unvaccinated adults in schools and the law's failure to include adults as subject to the vaccination requirements applicable to students surely carry plausible public health consequences. But the possibility that both adults and children may transmit disease does not, without more, establish that they pose comparable risks.

The Plaintiffs have not demonstrated a likelihood of success in showing that section 6355 treats comparable secular conduct more favorably than religious conduct in a manner that undermines the State's asserted interests to the same degree.

**ii. Selective Non-Enforcement**

In their rebuttal,[19] Plaintiffs argue that students with missing vaccination records constitute "a category of students the superintendents of the school districts have chosen to accommodate." *Pls.' Rebuttal* at 11. Citing generally, the "State's

---

[19] The Plaintiffs raise their selective-nonenforcement argument for the first time in their amended rebuttal. See *Brox v. Woods Hole, Martha's Vineyard & Nantucket Steamship Authority*, 706 F. Supp. 3d 151, 158 n.14 (D. Mass. 2023) ("The Renewed Reply is the fourth brief that plaintiffs have filed before the court on this issue, but this is the first time they have made this argument. The argument is waived." (citing *Wills v. Brown Univ.*, 184 F.3d 20, 27 (1st Cir. 1999) ("[T]heories offered for the first time in the reply brief are not preserved."))).; *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) ("The purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum."))). Nevertheless, the District Defendants responded to the argument in their sur-rebuttal, and the Court addresses it on the merits.

statistics" showing that between 758 and 1,625 students had missing vaccination records annually from the 2021–2022 through 2024–2025 school years, Plaintiffs contend: "[t]his is selective unenforcement and makes the Maine school vaccination laws not generally applicable." *Id.* at 11–12.

In response, the District Defendants assert that "Windham High School currently has a perfect record of Section 6355 compliance for its entire student population, including home-schooled students participating in WHS extracurriculars," and that "Section 6355 prescribes specific categories of exemption and leaves Superintendent Howell with no discretion to pick and choose between students." *District Defs.' Sur-Rebuttal* at 3.

The Court is not persuaded that missing-records figures Plaintiffs provided, assuming they are correct,[20] establishes a likelihood of selective non-enforcement. Although the figures purport to identify students whose vaccination records were incomplete, they do not establish that school officials knowingly permitted those students to attend school without satisfying section 6355, much less that officials tolerated such noncompliance while denying comparable accommodations to religious objectors. Moreover, the Plaintiffs have not identified students with missing vaccination records at WHS, where B.K. and E.K. seek to participate in athletics, and offer no evidence contradicting the District Defendants' representation that the school has a perfect record of compliance with section 6355.

[20] The Court is unable to determine the source of these statistics because the Plaintiffs have not provided supporting citations to the record, and, consequently, the Court cannot assess their reliability or the weight they should be afforded.

At this preliminary injunction stage, the Court concludes that the Plaintiffs have not demonstrated a likelihood of success in establishing that either Maine's school vaccination requirements under 20-A M.R.S. § 6355 or their application to homeschooled students participating in public school athletics under 20-A M.R.S. § 5021(5) violates the neutrality or general applicability requirements of the Free Exercise Clause. Nor have the Plaintiffs demonstrated a likelihood of success on their claims that the statutory scheme is subject to selective nonenforcement. Accordingly, the Plaintiffs have not established that strict scrutiny is likely to apply to their Free Exercise claims, and the Court evaluates their likelihood of success on the merits under rational basis review.

**c. Rational Basis Review**

Rational basis review asks whether the law is rationally related to a legitimate state interest. *See Heller v. Doe by Doe*, 509 U.S. 312, 319–20 (1993) ("a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity").

Maine has a legitimate interest in protecting schoolchildren and the public, particularly vulnerable individuals, from vaccine-preventable diseases. *See Doe,* 16 F.4th at 32 (observing that "[f]ew interests are more compelling than protecting public health against a deadly virus" and quoting *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011), for the proposition that "[t]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest"); *see also Perry*, 172 F.4th at 328 (states "have a legitimate interest in minimizing public health risks to the degree they deem advisable" and "can thus

require significant swaths of its population to be vaccinated, so long as it reasonably believes such a step would protect and promote the public health").

Requiring vaccination as a condition of school attendance is rationally related to that interest. *See We the Patriots*, 76 F.4th at 156 (upholding Connecticut's materially similar mandatory vaccination law for schoolchildren under rational basis review); *Jacobson v. Massachusetts*, 197 U.S. 11, at 35 (1905) (upholding compulsory vaccination law as valid exercise of police power). The Court is persuaded by Dr. Benowitz's testimony explaining how the transmission mechanisms of the nine diseases covered by Maine's school immunization requirements demonstrate the importance of vaccination in protecting the health of schoolchildren and the broader community. He explained that "[p]olio is transmitted person to person through the fecal/oral or oral/oral routes." Dr. Benowitz further explained that seven diseases — "diphtheria, pertussis, measles, mumps, rubella, varicella, and meningococcal disease…are all transmitted through the respiratory pathway". Specifically, he testified that "[f]or all of those -- all of those can generate large particles. Measles and varicella can also generate the smaller particles that I referred to as respiratory aerosols."

Dr. Benowitz testified that respiratory particles "can travel some distance," "typically six feet as the range." Though they can "land on a surface…we think about them most commonly causing infection when they're breathed in by a susceptible person." He distinguished measles and varicella because they also "generate airborne aerosols," which are "so small that they're carried readily on the drifts of air that

move around rooms." As to measles specifically, he testified that, if an infectious person entered the courtroom, "those particles will linger in this room for two hours after they leave," potentially infecting persons who subsequently entered. Finally, Dr. Benowitz explained that varicella and diphtheria "also have skin manifestations" that can "lead to transmission" through "skin to skin" contact.

The relationship between these vaccination requirements and the State's interest in protecting schoolchildren is particularly apparent in the context of interscholastic athletics, where students may breathe on, cough on, and come into physical contact with one another, creating opportunities for the transmission of communicable diseases.[21]

Tetanus presents a different but equally rational basis for requiring vaccination. As Dr. Benowitz explained, "tetanus is not transmitted person to person, it's transmitted from the environment to a susceptible individual." Vaccination against tetanus thus protects students against infection resulting from environmental exposure, including through wounds sustained during athletic activities. The State's interest in protecting schoolchildren from vaccine-preventable diseases encompasses both preventing the transmission of communicable diseases and protecting individual students against diseases acquired from the environment.

---

[21] As Dr. Benowitz testified "if the -- the vector the infected person is on the playing field an adult in the stands is pretty safely out of their range of those particles." For airborne diseases, he explained that "someone in the stand could still be susceptible but will probably be exposed to less than someone who is on the playing field". Thus, the proximity inherent in athletic participation is relevant to the risk of exposure, particularly for diseases transmitted through respiratory particles.

Accordingly, the Court concludes that the Plaintiffs are unlikely to succeed in demonstrating that 20-A M.R.S. § 6355 fails rational basis review.

### 2. The Equal Protection Clause Claim

The Plaintiffs' Equal Protection claim substantively overlaps with their Free Exercise claim. Plaintiffs contend that the Defendants' enforcement of Maine's school sports vaccination requirements against their children, despite their religious objections, is "unconstitutionally discriminatory" because the requirements "expressly provide comparable risk exceptions for other students." *Compl.* ¶ 46. They further allege that the Defendants do not enforce those requirements against "other students who have statutory exemptions but who pose comparable risks of spreading diseases," *id.* ¶ 48, or against "school employees who pose comparable risks of spreading diseases," *id.* ¶ 49. Because the Court has concluded that the challenged requirements do not violate the Free Exercise Clause, this overlapping fundamental-right-based Equal Protection claim is subject to rational basis review. *See Wirzburger v. Galvin*, 412 F.3d 271, 282–83 (1st Cir. 2005) (explaining that "[w]here a plaintiff's First Amendment Free Exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection fundamental right to religious free exercise claim based on the same facts"). As the First Circuit explained, "[w]hen a free exercise challenge fails, any equal protection claims brought on the same grounds are subject only to rational-basis review." *Doe,*16 F.4th at 35. For the reasons discussed *supra* Section IV.A.1.c, the Court concludes that the statutory distinctions are rationally related to the State's legitimate interest in

protecting public health and therefore survive rational basis review. Accordingly, the Plaintiffs are unlikely to succeed on their Equal Protection claim.

### B. Irreparable Harm

Courts assess irreparable harm on a sliding scale "in conjunction with a moving party's likelihood of success on the merits, such that 'the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010) (citations omitted).

The Plaintiffs seek preliminary injunctive relief permitting B.K. and E.K., who are homeschooled, to try out for and participate in interscholastic athletics at WHS notwithstanding their failure to satisfy Maine's school vaccination requirements. Without an injunction, B.K. and E.K. will be unable to participate in those athletic activities, including upcoming basketball tryouts, unless they satisfy the applicable vaccination requirements. *Compl.* ¶¶ 16–17.

The Supreme Court has long recognized that the loss of First Amendment freedoms, even for a brief period, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In the First Circuit, when plaintiffs make "a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Fortuño*, 699 F.3d at 15. Because the Plaintiffs have not made that showing here, the Court does not presume irreparable harm.

The Plaintiffs argue that "[n]o amount of money will compensate E.K. and B.K. for the loss of their rights to play high school sports." *Pls.' Mem.* at 4. However, "[t]here is . . . no independent constitutional right to engage in interscholastic athletics, either as a species of liberty (protected against deprivations independently) or as a species of property (protected against deprivations absent procedural due process)." *Pelletier v. Me. Principals' Ass'n,* 261 F. Supp. 2d 10, 13 n.9 (D. Me. 2003).[22] As this Court has previously observed, "[c]ourts have routinely rejected the notion that a student suffers irreparable harm by not being permitted to participate in interscholastic athletics." *Doe v. Portland Pub. Sch.*, 701 F. Supp. 3d 18, 39 (D. Me. 2023) (quoting *McGee v. Va. High Sch. League, Inc.*, 801 F. Supp. 2d 526, 531 (W.D. Va. 2011)); *see also S.B. ex rel. Brown v. Ballard Cnty. Bd. of Educ.*, 780 F. Supp. 2d 560, 569 (W.D. Ky. 2011) (rejecting a student's argument that exclusion from her original school's softball team following a disciplinary transfer constituted irreparable harm).

The Court recognizes the importance of interscholastic athletics to B.K. and E.K.[23] However, the Court distinguishes between the disappointment associated

[22] The School Defendants argue that "[a]lthough the Maine Constitution enshrines the importance of public education, there is no right to participate in school sports." *District Defs.' Opp'n* at 16 (citing ME. CONST. art. VIII, pt. 1, § 1). Unlike students excluded from school altogether, B.K. and E.K. do not face the loss of classroom instruction as a result of the challenged requirements.

[23] In reaching its conclusion, the Court has carefully considered Cassandra Krainis's testimony concerning her children's longstanding participation in school sports, including E.K.'s participation in soccer and basketball alongside the same teammates for several years and B.K.'s participation in basketball, football, and baseball. *Aff. of Pl. Cassandra Krainis* ¶¶ 4-5 (ECF No. 23). The Court also recognizes the social importance of these activities, noting in particular Mrs. Krainis's testimony that E.K. "would much prefer to play on the WHS team because it is a better team and most of her friend[s]—who she has been competing with over the years—are on the team there." *Id.* ¶ 16. The Court does not discount the disappointment and disruption that exclusion from these activities may

with exclusion from a preferred school sports team from the irreparable harm necessary to warrant preliminary injunctive relief.

Indeed, District Defendants contend that the conclusion that exclusion from interscholastic athletics does not constitute irreparable harm is "especially true" because "E.K. has the option of playing soccer for a different team, at Windham Christian Academy." *District Defs.' Opp'n* at 16. The Plaintiffs respond that their children "have a statutory right to play at WHS," that "the teams are better there," and that "most of their friends that they have been competing with all their lives play there." *Pls.' Second Reply* at 6.

Nothing, however, in the Plaintiffs' complaint, briefing, or Cassandra Krainis's supporting affidavit suggests that E.K. would be barred from playing soccer at a private school. Rather, Ms. Krainis' affidavit indicates that she has chosen not to register E.K. at Windham Christian Academy because WHS is E.K.'s preferred option, rather than her only option. *Aff. Of Pl. Cassandra Krainis* ¶ 16. As Ms. Krainis explained, "I did contact Windham Christian Academy to get information about their soccer team for my daughter, just in case we do not get the preliminary injunctive relief we are seeking. However, I have not registered her for the WCA team. She would much prefer to play on the WHS team because it is a better team and most of her friend - who she has been competing with over the years - are on the team there." *Id.*

---

cause B.K. and E.K., including the loss of opportunities to compete alongside their friends and longtime teammates.

Although the Court does not discount E.K.'s preference for playing alongside her longtime teammates, that preference does not establish that she is likely to suffer irreparable harm from being unable to play soccer at WHS, particularly where an alternative opportunity to participate in interscholastic athletics is available. As this Court explained in Doe, "[w]hile John may prefer to run for PHS, the Court finds that an inability to run for PHS, standing alone, cannot rise to the level of irreparable harm." *Portland Public Schools*, 701 F. Supp. 3d at 39. Even if private school athletics may entail additional expenses, such financial costs, standing alone, do not constitute irreparable harm. *See Foxboro Co. v. Arabian Am. Oil Co.,* 805 F.2d 34, 36 (1st Cir. 1986) ("We do not find irreparable injury where only money is at stake and where the plaintiff has a satisfactory remedy at law to recover the money at issue").

The Court therefore concludes that the Plaintiffs have failed to demonstrate a likelihood of irreparable harm in the absence of preliminary injunctive relief.

### C. Balance of Equities and Public Interest[24]

In weighing the equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 542 (1987)). In assessing the public interest, courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v.*

---

[24] The Supreme Court instructed that the last two factors in the TRO/PI analysis "merge when the Government is the opposing party" to the TRO; the Court follows this instruction and reviews the balance of the equities and the public interest in tandem. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

*Romero-Barcelo*, 456 U.S. 305, 312 (1982)); *see also Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005) (explaining that the public interest inquiry concerns "public interests beyond the private interests of the litigants").

Plaintiffs argue that any harm imposed on the Defendants and the public may be mitigated by the nature of the relief they are requesting, stating that "[t]he only conceivable countervailing harm to the Defendants if enjoined would be the possibility that B.K. could contract meningitis or that E.K could contract one of the 9 diseases and spread that disease to another unvaccinated player on the team who has one of the three statutory exemptions." *Pls.' Mem.* at 5. The Court does not agree that the nature of this relief sufficiently mitigates the harm of granting it.

First, the precise scope of the relief the Plaintiffs seek remains unclear,[25] making it difficult for the Court to assess the extent to which their proposed limiting conditions would protect other students or the practical burdens their implementation would impose on the District Defendants.

---

[25] In their briefing, the Plaintiffs expand their proposed conditions by offering "to not allow their children to play on a team if the coach or any assistant coaches of the team are not immunized." *Pls.' Second Reply* at 7. When asked during the evidentiary hearing whether he would agree to a preliminary injunction prohibiting B.K. from trying out for or playing on a team if a parent of a vaccinated student expressed concerns to the coach about B.K.'s vaccination status, Joshua Krainis answered, "Yes." He likewise answered, "Yes," when asked whether he would agree to the same condition for E.K. These additional conditions raise questions about precisely when, and under what circumstances, the Plaintiffs propose that B.K. and E.K. would be permitted to participate in interscholastic athletics.

In their subsequent briefing, the Plaintiffs further elaborated on their proposed injunction, requesting that the Court permit B.K. and E.K. to try out for or play on WHS sports teams "with provisos like" the following: "BK cannot try out for or play on a team if any other student trying out for or playing on the team is not vaccinated against meningococcal meningitis, tetanus, pertussis, or diphtheria," and "EK cannot try out for or play on a team if any other student trying out for or playing on the team is not vaccinated against any of the 9 diseases." (emphasis omitted). *Pls.' Privacy Mem.* at 1–3. The Plaintiffs also proposed conditions restricting participation based on parental or coach objections and the vaccination status of opposing players. *Id.* at 2–3.

Second, although the Plaintiffs have now provided a more detailed explanation of how their proposed conditions would operate, significant questions remain concerning the additional administrative burden their implementation may entail. *See Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016) (recognizing that "the administrative burdens of compliance with the preliminary injunction are a real harm"). In their supplemental filing, the Plaintiffs propose that school nurses review the vaccination records of students trying out for or participating on a team and advise the relevant coach, directly or through a school administrator, whether any student lacks a vaccination that B.K. or E.K. has not received. *Pls.' Privacy Mem.*at 3–4. They further propose that coaches notify parents of the participation of an unvaccinated student and that opposing coaches consult their own school nurses to determine whether any opposing player has a relevant vaccination exemption. *Id.* at 4–5.

The District Defendants respond that "[t]here is no administrative process currently in place to conduct the system of inquiry and notice that Plaintiffs envision." *District Defs.' Resp. to Pls.' Privacy Mem.* at 4. Superintendent Christopher Howell, who oversees RSU 14 Windham Raymond, explained that Plaintiffs' proposed injunction would not be feasible "[a]bsent establishment of a league-wide system for notification of vaccination status, which does not exist and would take time to develop". *Howell Decl.* ¶ 22 (ECF No. 18-1). The District Defendants further observe that "[i]f team rosters change during the season, that adjustment could prompt renewed inquiries and notices," requiring "the ongoing work

and cooperation of many dozens of school personnel." *District Defs.' Resp. to Pls.' Privacy Mem.* at 4.

Superintendent Howell testified that he would not disclose students' vaccination information to another school district "unless directed to by a court." On cross-examination, he confirmed that he could provide such information to another superintendent "if I was legally required to do so." This testimony raises further concerns about the feasibility of implementing the proposed injunction across other school districts. It is unclear whether, to comply with the Plaintiffs' suggestions, the Court would be required to order opposing school districts to disclose their students' vaccination status, a potential violation of the students' privacy rights. It is also unclear whether the proposed injunction would have to be circulated to the administrators, school nurses, coaches, or parents of every opposing team to ensure that the Plaintiffs' proposed conditions could be implemented.

Although the Court appreciates the Plaintiffs' innovative attempts to mitigate the impact of a favorable order on others, including team members, the Court is not convinced that their suggestions are practical or workable. The Plaintiffs have not explained how such an arrangement would operate, and how precisely the injunction would describe the Defendants' roles in ensuring all relevant parties are informed. The Court must "consider the effect on each party" of the requested relief, *Winter*, 555 U.S. at 24, which must be "no more burdensome to the defendant than necessary," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Without knowing how

the proposed conditions would operate against these concerns, the Court cannot conclude that they would adequately mitigate the resulting harms.[26]

Furthermore, because the other school districts are not parties to this litigation, it is unclear whether the Court could compel their cooperation in implementing the proposed injunction. The District Defendants explain that implementing the proposal would require contacting "at least sixteen other school districts at the start of each athletic season" and coordinating among coaches, school nurses, athletic directors, and superintendents. *District Defs.' Resp. to Pls.' Privacy Mem.* at 4. If "none of the relevant school districts are parties to this litigation" and "[i]f they refuse to cooperate with Plaintiffs' proposal, it is not clear that this Court's order could be enforced against them." *Id.* at 5; *See G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 35 (1st Cir. 1980) ("To hold a nonparty bound by an injunction it is thus essential to prove either that the nonparty participated in the contumacious act of a party or that the nonparty was subject to the injunction because legally identified with a party.").[27] The Plaintiffs have not addressed this concern.

---

[26] The uncertainty surrounding the proposed relief also raises concerns under Federal Rule of Civil Procedure 65(d)(1), which requires an injunction to "state its terms specifically" and "describe in reasonable detail" the acts restrained or required. As the Supreme Court explained, "[T]he specificity provisions of Rule 65(d) are no mere technical requirements"; the Rule is "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). *See also Scott v. Schedler*, 826 F.3d 207, 212 (5th Cir. 2016) (explaining that an injunction must permit "an ordinary person reading the court's order" to "ascertain from the document itself exactly what conduct is proscribed" (citation omitted*)); Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (requiring sufficient specificity to inform those subject to an injunction "what the court intends to require and what it intends to forbid").

[27] The District Defendants further observe that "each school may have its own questions and concerns about FERPA and student privacy," potentially requiring "more than a dozen separate districts" to seek legal advice before establishing a compliant information-sharing process. *District Defs.' Resp. to Pls.' Privacy Mem.* at 5. The Court recognizes this practical concern.

The Court has an additional concern regarding the nature and enforceability of the Plaintiffs' proposed preliminary injunction. Under the Plaintiffs' proposal, B.K.'s and E.K.'s ability to participate in school athletics would depend, in part, on objections raised by parents of vaccinated teammates and information supplied by opposing coaches. *Pls.' Privacy Mem.* at 1–4. Although the Court would determine the scope and conditions of any preliminary relief, and a parent's objection would merely trigger a condition already established by the Court rather than constitute an independent adjudication of the Plaintiffs' constitutional rights, the proposal would nevertheless place substantial practical control over the availability of federal injunctive relief in the hands of private individuals. Assuming that the Court were to conclude that the Plaintiffs are exercising their constitutional religious rights in playing for the WHS teams, it seems odd at best to allow third parties to countermand their exercise of religious rights. The Court is aware of no other situation where an individual's exercise of a constitutional right depends upon the acquiescence of others. *See Scaer v. City of Nashua*, 162 F.4th 256, 264 (1st Cir. 2025) (describing the heckler's veto doctrine).

In *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), the Supreme Court considered a statutory scheme permitting churches and schools to veto applications for liquor licenses and expressed concern that the delegated authority was "standardless, calling for no reasons, findings, or reasoned conclusions." *Id.* at 125. Although *Larkin* arose under the Establishment Clause and did not address the delegation of Article III power, its reasoning illustrates the difficulties presented

when governmental authority is made dependent on the discretionary decisions of private parties. Here, the Plaintiffs' proposal contains no apparent mechanism for determining whether a parent's objection reflects a genuine concern about vaccination or instead arises from competitive advantage, disagreement with the Plaintiffs' religious beliefs, personal animosity, or some other improper consideration.

Indeed, Mr. Krainis acknowledged the possibility of gamesmanship, questioning whether the Court could "keep those other coaches honest though to make sure it's not just to try to get one up on Windham." As in *Larkin*, the proposal provides no apparent "effective means of guaranteeing" that the authority conferred would be exercised for its intended purposes. 459 U.S. at 126. Even if this arrangement would not constitute a formal delegation of Article III judicial power, the Court is troubled by the prospect of issuing an injunction backed by the authority of the federal judiciary whose practical effect would depend on the discretionary decisions of private individuals, potentially acting for reasons unrelated to the purposes of the injunction. The Court must ensure that its orders are sufficiently clear and definite to be enforced, and the Plaintiffs' proposal raises serious questions about whether an injunction effectively allowing private individuals to determine when B.K. and E.K. may exercise their court-ordered rights would satisfy those requirements.

Moreover, the Court is not convinced that the Plaintiffs' proposed conditions sufficiently account for the privacy interests of other students. As the District Defendants point out in their opposition, "[u]nder the Family Educational Rights and

Privacy Act [FERPA], immunization records are considered 'education records' and cannot be disclosed without student consent." *District Defs.' Opp'n* at 18 (citing 20 U.S.C. § 1232g(a)(4)(A); 34 C.F.R. § 99.3). Although FERPA permits certain disclosures to school officials with "legitimate educational interests," 20 U.S.C. § 1232g(b)(1)(A), and disclosures "in compliance with judicial order," *id.* § 1232g(b)(2)(B), these exceptions do not eliminate the need to consider whether the Plaintiffs' proposed information-sharing arrangements would adequately safeguard other students' confidential vaccination information.

Congress expressly recognized "the rights of privacy of students and their families," 20 U.S.C. § 1232g(c), and FERPA's implementing regulations protect information that, "alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty." 34 C.F.R. § 99.3. Thus, the Plaintiffs' assurance that "[n]o names need to be disclosed," *Pls.' Second Reply* at 7, does not necessarily resolve the privacy concerns raised by their proposal, particularly where implementing it may require the involvement of school administrators, nurses, coaches, and parents across multiple school districts. As the District Defendants explain, "[b]asketball teams are relatively small, and students and families alike could quickly determine, via process of elimination, which student holds the exemption." *District Defs.' Resp. to Pls.' Privacy Mem.* at 3. The Commissioner similarly cautions that "an attempt to de-identify the information by removing the student's name may be insufficient to render

it non-personally identifiable." *Commissioner's Resp. to Pls.' Privacy Mem.* at 3. Hypothetically, if an unvaccinated student joined a team midseason, and B.K. or E.K. was suddenly excluded from playing for the rest of the year, the reason for their exclusion could effectively reveal the new student's vaccination status.

More fundamentally, parents of students participating in public school sports and members of the public are entitled to rely on school officials to enforce the vaccination requirements established by the Maine Legislature without having to monitor compliance themselves. The Plaintiffs' proposed injunction would complicate that arrangement by introducing court-created exceptions that other parents might need to identify and affirmatively object to in order to protect their children. The Court is reluctant to impose this additional burden on families who reasonably expect the statutory vaccination requirements to be followed. The District Defendants similarly argue that "the health and safety protections of Maine's vaccination requirement should not depend on a parent 'opting in,'" particularly given the "significant social pressure against a parent's exercise of this veto right." *District Defs.' Resp. to Pls.' Privacy Mem.* at 5.

Finally, the Plaintiffs' proposal appears to assume that B.K. and E.K. would be the only students permitted to participate without satisfying the statutory vaccination requirements or qualifying for an exemption. Indeed, the Plaintiffs assert that "[a]ll other players on the team, who can't claim one of the statutory exemptions, should have all the required vaccinations." *Pls.' Mem.* at 5 n.1. But if the Court granted the requested injunction here, other students asserting religious

objections might well seek comparable relief. The potential participation of multiple unvaccinated students who do not qualify for any statutory exemption could undermine the very protections that the Plaintiffs' proposed conditions purport to preserve, and risk creating an exception that would swallow the Legislature's rule.[28]

The Plaintiffs argue that the balance of equities and public interest favor an injunction, offering to have the Court "allow[] the Defendants to prohibit E.K. and B.K. from trying out and/or participating on a team if any other player on the team has a statutory exemption and is unvaccinated." *Pls.' Mem.* at 5. The District Defendants counter that "[t]his proposal ignores that communicable diseases pose risks to vaccinated students, and it is also unworkable." *District Defs.' Opp'n* at 18. They maintain that E.K.'s participation would "heighten the danger of serious illnesses for every other player she encounters, plus the wider community that may be exposed." *Id.* at 17. The Commissioner similarly argues that she "seeks to protect the health of students across the State, and that far outweighs the harm, if any, that Plaintiffs may suffer from not being able to play sports at WHS." *Commissioner's Opp'n* at 21 (quoting *Doe*, 16 F.4th at 37 ("Maine's interest in safeguarding its residents is paramount")).

The Court recognizes that both sides have substantial interests at stake. The Plaintiffs have sincere religious objections to vaccination and are anxious that their

---

[28] The authority to create additional exemptions to Maine's vaccination requirements rests with the legislature, not the judiciary. *See Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts.").

children are able to participate in athletics alongside their longtime teammates. Having observed both Mr. and Ms. Krainis, the Court has no doubt that they are sincere, loving and concerned parents who are anxious that their children, who are apparently talented athletes, have athletic opportunities consistent with their religious views.

At the same time, the State has an extremely substantial interest in protecting students from serious, and vaccine-preventable, diseases, and protecting student privacy. The Court is also mindful of the added administrative burdens identified by the District Defendants in implementing the Plaintiffs' proposed conditions. Even though the Court concludes that both parties have legitimate and substantial interests at stake, the Court concludes on balance that the State's interest in public health outweighs the Krainis's interest in requiring a potentially risky accommodation to their religious beliefs.

## V. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' motion for a preliminary injunction (ECF Nos. 5, Attach. 7, 6, Attach. 9)[29].

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 16th day of November, 2026

[29] The Plaintiff's motion for PI is entered twice on the docket at ECF Numbers 5 and 6 as attachments 7 and 9 respectively.